Williamson Plumbing v. Stockdale, No. 1565-02 Cncv (Katz, J., Feb. 13, 2004)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

STATE OF VERMONT                                    SUPERIOR COURT
Chittenden County, ss.:                         Docket No. 1565-02 CnCv


WILLIAMSON PLUMBING

v.

STOCKDALE


FINDINGS OF FACT
CONCLUSIONS OF LAW
NOTICE OF DECISION


Plaintiff commenced this action to recover amounts allegedly past due for plumbing installation work at defendants' new home in Jericho. Defendants dispute the amounts claim, alleging breaches of contract,

largely issues of workmanship. The matter was tried February 9, 2004. On the basis of the evidence presented, the following decision is announced.

FINDINGS OF FACT

1. Homeowners accepted plumber's proposal for work to be done, at a particular price, and work began. For the most part, the relationship went smoothly, with pre-printed invoice forms and prompt payments. Several disputes arose at the end of the job, which we will rule on individually.

2. Although there was an agreement that plumber could hang pipes in any manner that was most convenient to him within the "mechanical room" in the basement, subject only that the work be neat, there was no real discussion regarding pipe location outside that room.

3. In fact, plumber installed the water supply intake vertically, outside the perimeter wall, such that it intrudes into the room. Although the evidence was not explicit on the subject, it appears from the photos that this vertical pipe probably extends into the basement area about four inches. Based on the photo entitled "Ceiling" in defendants' exhibit 13, this vertical pipe is near the "mechanical room" and the stairs to the garage. Were it to be boxed in, it would be minimally intrusive of the main basement area, and not unsightly. On the other hand, putting the vertical pipe within the wall, as the homeowners now suggest, would leave it with less insulation and therefore more prone to winter freezing. Coming from the ground, the well water would tend to start out very cold. Were the water not run for a number of hours, a pipe in the wall would

seem prone to freezing.

4.       There was no discussion between the parties regarding location of this pipe. There are no written specifications. Under all the circumstances, it was not poor workmanship to locate the pipe as it was. It's location is not a breach of contract.

5.       The same photo shows the plastic waste pipe hanging below the joists supporting the main floor. As such it tends to restrict ceiling height. However, the photo shows that pipe again in the vicinity of the mechanical room, where the plumber had been given a freer hand, because appearance was not the issue. There was no proof as to the waste pipe extending into the main basement area, to the diminution of effective ceiling height.

6.       A one inch steel gas line was installed below the joists. It could have been run within the joists, thereby preserving ceiling height. It is not clear how long a section could have been fit through the joist openings, or if smaller sections would have had to have been joined, as this steel pipe has no real flexibility. There was no written contract specification calling for this pipe to be completely within the joists. It lies virtually against the outside wall. Hence, it could have been boxed out, or the wall brought out about four inches, and thereby avoided any ceiling height loss in the great expanse of the basement.

7.       One pipe feeding upstairs heating units runs within the joists, but then dips down to avoid the large steel I-beam. Again, running under the I-beam causes an effective loss of height.

8.      First, we find that the plumber was reasonable in declining to simply drill through the beam without clear prior authority.  The beam is an obvious structural member.  It must not be compromised.  It may well be that a 1 ½ inch hole, drilled into a fourteen inch beam, would have minimal effect on strength or rigidity.  But the plumber is not expected to know this.  Not working for the general contractor, the plumber brought the issue to the attention of the homeowner, asking for a decision from engineer or architect.  The homeowner did not get back to the plumber with a prompt answer, so the latter ran the pipe below the beam, as shown in photo "Ceiling 2."

9.      Second, we note from the photo that this is in the corner of the room.  Again, it could have been boxed out, without any significant harm to aesthetics or the overall ceiling height.

10.     Homeowner next asserts that the wall-hung hot water heater was improperly installed.  The manufacturer's instruction sheet calls for the heater to have 36 inches clearance beneath any combustible or non-combustible surface.  In fact, it was installed very close to one floor joist, and perhaps only a foot beneath the subflooring above.  The plumber's experienced foreman testified that the 36" clearance is an old specification, no longer recommended by the manufacturer.  In support of this belief, he brought to court a manufacturer's spec sheet.  In fact, that sheet both calls for a six inch clearance, which in part this installation did not enjoy, and it relates to a different model (2532) than the one installed (2402).

11.     Only two weeks before trial, the heater was ruined by freezing.  Apparently, cold air entered the concentric exhaust/air inlet pipe, and

cracked the copper heating vessel.  Homeowner believes that had there been a longer rise, resulting from a lower installation, the cold air might not have penetrated as it actually did.  We note however that the manufacturer does not specify any minimum rise in the specification sheet/installation instructions.  In the end, it is merely speculation that a lower installation would have made a difference.  The plumber was persuasive that the mere length of the pipe outside may have exposed it to too much cold air.  There was no proof that the first installation caused the freeze damage.  Further, the manufacturer replaced the unit free.  The replacement unit was installed lower than the original.  The manufacturer did not pay for installation of the second unit, which cost homeowners $526.  But a significant portion of that would have had to have been paid merely to reinstall the second unit identically to the first.  The cost of lowering the second unit must only have been a part of that cost.

12.     In the end, we are persuaded that the plumber should have followed the spec sheet for this particular model, although we cannot find that the freeze damage was caused by any failure to follow that sheet.  It was therefore reasonable for the homeowner to have the replacement unit installed at a lower height.

13.     Upstairs, a trim plate for an "inner 45°" corner of the baseboard heating was never installed.  Homeowners purchased the item and installed it themselves. No price was put in evidence.

14.     A pedestal sink in the downstairs bathroom was never installed. A small $1.50 part was required, and homeowner did not obtain the part until the plumbers left the job.  But it was clearly understood that, with homeowners supplying fixtures, they were responsible for all parts.

Under these circumstances it is not reasonable to expect the plumber to make a separate trip, whenever the homeowner finally comes up with the necessary small part.  There never was a time when the homeowner had the part, together with any other "punch list" work, such that the plumber should have been expected to return to the site.

15.     Rough in plumbing, within the cellar slab, was never part of the contract.  Hence, it is an appropriate extra.  After that plumbing was already in place, the proposal was modified to include the cellar bathroom.  But the price in the contract proposal, accepted as the contract, was merely running plumbing to the bathroom and hooking up fixtures.  It did not include the slab work.  As the slab work involved an extra trip to the site, the plumber's cost is a reasonable one.

16.     Homeowners have two estimates for "correcting" work of which they complain, particularly rerouting pipes.  The two average out to about $1,300.  We have, however, already noted that some of the work complained about was not unreasonable, under the circumstances.


CONCLUSIONS OF LAW

17.     In order to recover, homeowners must not only show a breach, but also that they were harmed by that breach.

18.     When there is no written specification on a particular point, the law will examine plumbing decisions in light of the prevailing standard of workmanship in the area.  13 Am. Jur. 2d Building and Construction Contracts § 12.  Hence, the decision to have the water supply pipe

alongside, rather than within the cellar wall was reasonable within this standard, as was the decision to have the long, rigid gas line immediately below the joists and adjacent to the wall. The decision to go under the I-beam, instead of through it without an engineer's approval, was reasonable given the potential for liability and damage the plumber faced going through a support beam without the engineer's approval.

19.     Findings cannot be based upon speculation. See, e.g., Pratt v. Dep't of Social Welfare, 145 Vt. 138, 143–44 (1984) (invalidating board's findings as based on speculation and conjecture). The belief that the water heater froze because of being installed too high is not supported by solid evidence. It is plausible, but tends to be rebutted by the manufacturer's failure to specify a minimum rise on the exhaust. Given a different cellar configuration, the unit could be in the same location relative to the ground, yet 36" below the floor joists, and still have suffered the same freeze.

20.     The charge of two per cent per month interest, although apparently called for in the proposal (copy of third page not included among exhibits) is not permitted. 9 V.S.A. § 41a. Under 9 V.S.A. § 50 there are two potential penalties. The first is to reduce the interest rate to the legal limit and return, with interest, anything paid above and beyond this rate. 9 V.S.A. § 50(a). The second is to strike all interest and forgive one half of the principal, when the "lender" exceeds the permitted rate. 9 V.S.A. § 50(b). To apply the second, harsher penalty, we are required to make a finding that the lender deliberately intended to violate Vermont usury laws. Crocker v. Brandt, 130 Vt. 349, 357–58 (1972). We are not persuaded that plumber here intended to do anything of the sort. The rate of interest at issue was part of a pre-printed form that plumber purchased,

most likely at an office supply store. It was probably printed out of state and neither plumber, printer, nor Staples realized it was in contravention to Vermont interest rate law. As such, this rate is best classified as and "innocent act" and therefore properly subject only to the limit imposed by § 50(a). Additionally, plumber here was not a lender in the sense of § 50. He did not enter into this relationship actually lending money and never had the expectation that he would lend money. Instead, he is in the position of having provided services, and then not been paid his bill. As such, he is still limited by the legal rate, but should not suffer the harsh penalties imposed upon lenders who intend from the start of the transaction to lend money and commit usury.

21.     On the basis of the foregoing, the sum of $3,784 was reasonably billed by plumber to homeowners. We are persuaded, however, they are entitled to a $320 credit against that sum for replumbing the wall-hung water heater to comply with manufacturer's specification. The balance of their recent bill would have been due merely for replacing a unit which had been properly installed, but nevertheless was damaged by freezing.

22.     We are not persuaded by the balance of homeowners' contentions regarding the piping issues. First the plumber made reasonable decisions in the absence of clear instructions. Second, the reasonable homeowner faced with the pipe-below-the-joists situation here involved would probably not have lowered the entire ceiling, would not have paid $1,300 to raise the pipes, but would, instead have boxed out the offending protrusions, located as they are to the side and in the corner.

23.     Plaintiff requests attorneys fees through a contractual provision. The general rule in Vermont is the "American Rule," which means that parties pay their own legal fees absent contractual agreement or statute.

D.J. Painting, Inc. v. Baraw Enters., 172 Vt. 239, 246 (2001). As a derogation to the general rule, we will only accept such contract language that justifies such a departure. Bruntaeger v. Zeller, 147 Vt. 247, 255 (1986); see also Concord Gen. Mut. Ins. Co. v. Woods, 2003 Vt. 33, at ¶ 18. If attorney fees are included in the contract between the parties, plaintiff claimed more than it was due, particularly because of excessive interest, defendant was justified in not paying that demand. As such, we conclude that plaintiff is not the prevailing party, such that it should be awarded attorneys fees. See Union of Needletrades, Indus. & Textile Employees v. I.N.S., 336 F.3d 200, 205–08 (2d Cir. 2003) (defining the high standards for prevailing and substantially prevailing).

NOTICE OF DECISION

Plaintiff is entitled to judgment in the amount of $3,484, plus interest at the legal rate from May 15, 2002, and costs. A proposed judgment should be submitted.


Dated at Burlington, Vermont, _____, 2004.


_____
Judge